IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDTRONICS, INC., et al.,            )
                                     )
                    Plaintiffs,      )
                                     )
        v.                           )    No.  06 C 3917
                                     )
AURORA PERFORMANCE PRODUCTS LLC,     )
etc., et al.,                        )
                                     )
                    Defendants.      )

<u>MEMORANDUM OPINION AND ORDER</u>

Midtronics, Inc. ("Midtronics") claims that Aurora

Performance Products LLC d/b/a Argus Analyzers ("Argus") and

BPPower, Inc. ("BPPower") have infringed its United States Patent

5,821,756 (the "'756 Patent"), entitled Electronic Battery Tester

with Tailored Compensation for Low State-Of Charge.[1]  Having

reached an impasse as to the meaning of certain of the claim

terms, the parties now look to this Court for aid in claim

construction.[2]  This opinion conducts a <u>Markman</u> analysis to

construe language contained in various claims of the '756 Patent.

<u>Tenets of Claim Construction</u>

In an action claiming patent infringement, the court must

resolve any disputed issues of claim construction before moving

_____

[1]  Citations to the '756 Patent will utilize a colon, with
the number preceding the colon denoting the column and the number
after the colon denoting the line.

[2]  Midtronics has filed an initial ("M. Mem.") and a
responsive ("M.R. Mem.") memorandum, while Argus and BPPower have
jointly filed corresponding memoranda ("A-B Mem." and "A-B R.
Mem.").

to the infringement claim (<u>Apex Inc. v. Raritan Computer, Inc.</u>, 325 F.3d 1364, 1370 (Fed. Cir. 2003)).  Construction of a patent claim presents a question of law through which the court determines the scope and meaning of the claim (<u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 372 (1996)).

To that end claim terms should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art as of the effective filing date of the patent application (<u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).  Claim language is the most important indicator of the meaning of the claim and should therefore be the central focus of the analysis (<u>Middleton, Inc. v. Minn. Mining & Mfg. Co.</u>, 311 F.3d 1384, 1387 (Fed. Cir. 2002); <u>Phillips</u>, 415 F.3d at 1312).  Beyond the claim language, a construing court should look primarily to other intrinsic evidence: other claims within the same patent, the patent's specification and the prosecution history (<u>Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.</u>, 222 F.3d 951, 955 (Fed. Cir. 2000)).  But as helpful as a patent's specification may be in claim construction (<u>Phillips</u>, 415 F.3d at 1315), a court must be mindful to avoid importing limitations from the specification into the claims (<u>id</u>. at 1323).

If ambiguity lingers after the application of intrinsic evidence, a construing court may then turn to extrinsic evidence to supplement its interpretive efforts (<u>Vitronics Corp. v.</u>

Conceptronic, Inc., 90 F.3d 1576, 1583-84 (Fed. Cir. 1996)).  For
example, judges may consult and rely on dictionary definitions,
although extrinsic in nature, so long as the definitions do not
contradict claim terms (id. at 1584 n.6).  But when the patentee
dons a lexicographer's cap and crafts special definitions, those
specially defined meanings trump ordinary usage--and so
dictionary definitions are not then a proper resource (id. at
1582; Phillips, 415 F.3d at 1316).

### Patent Subject Matter

Midtronics's patent claims an improvement on previous
battery testers ('756 Patent abstract).  Dr. Keith Champlin
("Champlin"), one of the three co-inventors of the '756 Patent,
has amassed numerous patents relating to battery testers since
the 1970s (M. Mem. 2; A-B Mem. 3), essentially creating an
alternative to previous battery testers that had employed
"discharge testing" (M. Mem. 3; A-B Mem. 2).

Discharge testing (also known as load testing) subjects the
battery to a direct current load having a predetermined value for
a prescribed period of time (M. Mem. 3; A-B Mem. 2).  That
process has several disadvantages.  Among those, it causes the
battery to lose considerable energy immediately after the test
and is not repeatable because it creates changes in the battery's
chemistry (M. Mem. 3-4).

Champlin invented "dynamic testing" in the 1970s by

3

measuring what he calls the dynamic conductance of the battery
(M. Mem. 4-5).  Dynamic testing (which utilizes a low energy
small signal) is repeatable and does not alter the battery under
test (M. Mem. 5-6).  Because not all battery types are designed
in the same way,[3] the accuracy of the test can be compromised
unless the type of battery being tested is taken into account (M.
Mem. 7).  In that respect the '756 Patent claims an improvement
over previous dynamic testers by adjusting for different battery
types to create more accurate test results (M. Mem. 7).

<u>Disputed Claim Terms</u>

Midtronics offers four claim terms for construction:
(1) dynamic battery parameter, (2) dynamic resistance,
(3) dynamic conductance and (4) intermediate dynamic parameter
(M. Mem. 1).  Argus and BPPower state that the only claim term in
need of construction is "dynamic," and they offer "measured using
an alternating current signal" as their proposed meaning (A-B
Mem. 1).

At the outset it is helpful to review some basic electrical
terms.  "Current" is the movement of an electric charge through
an electrical element (think of a charge moving through a copper
wire) (M. R. Mem. 3 n.2).  "Conductance" is the measure (in
"mhos") of the ability of a circuit to conduct electricity

---

[3]  For instance, automotive batteries differ depending on
whether they are designed for hot or cold climates (M. Mem. 6).

4

(McGraw-Hill Dictionary of Scientific and Technical Terms [hereafter simply "Scientific Dictionary"] 434 (5th ed. 1994)). "Resistance" is the measure (in "ohms") of the opposition of a circuit to the flow of electrical current (as such, it is the inverse of resistance[4]) (McGraw-Hill Encyclopedia of Physics 328 (2d ed. 1993)). "Polarity" is the direction of the current and is either positive or negative (M. R. Mem. 3 n.2). Two types of electrical currents are alternating and direct currents ("AC" and "DC").

Dynamic Battery Parameter

"Dynamic battery parameter" (used in Claims 1, 5, and 7) can be easily construed:  It is defined in the specification as "intended to refer to either the dynamic conductance or the dynamic resistance of a battery" ('756 Patent 17:62-64; M. Mem. 11-12; A-B Mem. 6).  And of course patentees are free to act as their own lexicographers and to create or define terms as they please (Vitronics, 90 F.3d at 1582).  Although the quoted definition does not provide an ultimate answer to the meaning of "dynamic," it is a start.

Dynamic Resistance and Dynamic Conductance

"Resistance" and "conductance" (already briefly described) are well-defined terms in the art.  Resistance is the voltage

---

[4]  Conductance can be expressed mathematically as 1 divided by resistance, and resistance can be expressed as 1 divided by conductance (M. Mem. 12-14).

across an electrical element divided by the current passing
through the element (Scientific Dictionary 1693).  Conductance is
the inverse:  the current passing through an electrical element
divided by the voltage across the element (id. at 434).  What
must be determined is the effect that "dynamic" has on those
terms in the context of the '756 Patent.

Both parties characterize dynamic as "time-varying" (M. R.
Mem. 6-7, 13; A-B Mem. 11), but Argus and BPPower proceed one
step further and draw the conclusion that a time-varying current
must be AC (A-B Mem. 11; 14).  They offer this definition of AC
(Authoritative Dictionary of IEEE Standard Terms 28 (7th ed.
2000)):

> (1) An electric current that reverses direction at
> regularly recurring intervals of time.  Contrast:
> direct current.

> (2) A periodic current with an average value over
> a period of time of zero.[5]

As thus defined, an AC must change polarity (also known as
reversing direction), alternating between positive and negative
charges.  That requires a time-varying (non-static) current.  But

---

[5] To satisfy that second standard--calling for an average
value of zero--current must alternate between identical positive
and negative charges (+30 and -30 for example) at a regular
interval.  Each time the charge switches from positive to
negative (changes polarity), the current reverses direction.  By
contrast, DC is a unidirectional current in which the changes in
value (polarity) are either zero or so small that they may be
neglected (Authoritative Dictionary of IEEE Standard Terms 312
(7th ed. 2000)).

not all time-varying currents will satisfy the AC definition.
For instance, if a current alternated regularly between a zero
charge and a positive value, the current would be time-varying
but not AC (because it would never change polarity and reverse
direction) (M. R. Mem. 5 Fig. 4).

Argus and BPPower point to extrinsic evidence in which
Midtronics representatives--either Champlin or Midtronics'
opinion witness or its attorneys--refer to time-varying aspects
of the '756 Patent in deposition testimony or memoranda filed in
other cases.  But such references, even if appropriate for
consideration, do not support the conclusion that "dynamic" as
used in the '756 Patent means AC.  Instead they are entirely
consistent with Midtronics' submissions as to the '756 Patent and
its claims language, asserting that "dynamic" means time-varying
but that time-varying does not necessarily mean AC.[6]

Such a reading of "dynamic" sustains Midtronics' proposed
constructions of "dynamic resistance" and "dynamic conductance."
Adding "dynamic" to the well-known terms "resistance" and
"conductance" incorporates the notion of measuring changes in

_____

[6]  M. R. Mem. 9-11 correctly (and persuasively) argue that
the Argus-BPPower contention that would limit "dynamic" to an AC
current would impermissibly exclude Midtronics' preferred
embodiment.  That "is powerful evidence that the [Argus-BPPower]
construction is incorrect" (Nellcor Puritan Bennett, Inc. v.
Masimo Corp., 402 F.3d 1364, 1368 (Fed. Cir. 2003)(adapted to
this case), adhering to the principle announced in Vitronics, 90
F.3d at 1583).

7

value over time.  This Court adopts Midtronics' position that "dynamic resistance" is "the change in voltage through an element divided by the change in current across the element" and "dynamic conductance" is "the change in current through an element divided by the change in voltage across the element."

Intermediate Dynamic Parameter

"Intermediate dynamic parameter," the last term to be construed, does not appear in the '756 Patent specification, but its meaning can be discerned from its use in the claims.  Claim 1 teaches a device containing circuitry that determines an intermediate dynamic parameter of the battery being tested ('756 Patent 18:12-14).  Correction circuitry then adjusts that figure, depending on the battery type, to arrive at the adjusted intermediate parameter ('756 Patent 18:17-27).

Intermediate dynamic parameter can best be thought of as the base test result that is returned before it is adjusted to account for differences in battery type.  That reading is consistent with the term's usage across the claims (Claims 1, 2, 3, 5, 7, 9 and 11).  This Court therefore construes "intermediate dynamic parameter" in conformity with Midtronics' proposed construction:  "unadjusted or uncorrected dynamic battery parameter."

8

<u>Conclusion</u>

This opinion has construed the disputed claim terms of the '756 Patent (all in favor of Midtronics's more persuasive arguments).  Nothing said here of course expresses a view as to patent validity or infringement,[7] but it is now possible to move forward on those fronts.  This action is set for a telephonic status hearing at 1 p.m. July 16, 2008.

_____
Milton I. Shadur
Senior United States District Judge

Date:  July 11, 2008

---

[7]  In that respect, the Argus-BPPower opening gun engages in a needless--indeed inappropriate--discussion of the merits as between their "Accused Products" and the '756 Patent.

9