**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **Midtronics, Inc.**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06 CV 3917 |
| | ) | |
| **Aurora Performance Products LLC d/b/a** | ) | Judge Milton Shadur |
| **Argus Analyzers** and **BPPower Inc.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's Order of September 10, 2010 (Docket No. 170), Plaintiff

Midtronics, Inc. submits its proposed findings of fact and conclusions of law that it will prove at

trial before the Court.

## Definitions

A.      "Accused Products" means the Argus AA350, AA400, AA500, AA500P, and

AA550P battery testers.

B.      "'756 Patent" means the patent-in-suit, United States Patent Number 5,821,756.

C.      "'416 Patent" means United States Patent Number 4,912,416.

D.      "Uncontested Fact" refers to the statements of uncontested facts in § II(a) of the

pre-trial order (Docket No. 171).

## Proposed Findings of Fact

### I. Midtronics and Dr. Champlin

1. Midtronics was founded in 1984.

2. Midtronics is headquartered in Willowbrook, Illinois.

3. Midtronics employs over 150 people at its Willowbrook headquarters.

4. Midtronics specializes in designing and manufacturing battery testing devices and is the world's largest maker of battery testing devices for industrial and automotive batteries.

5. Stephen McShane is the president and chief executive officer of Midtronics.

6. Kevin Bertness is the chief technical officer of Midtronics. He was hired in 1994 as the battery testing industry first began to commercially embrace digital technology.

7. Midtronics owns rights to more than 150 patents relating to battery testing and continues to apply for patents.

8. Midtronics has won numerous awards for its innovations and inventions in the battery testing area, including placing among the top 20 innovators by Motor Magazine for numerous years.

9. Dr. Champlin was a professor in electrical engineering at the University of Minnesota for 39 years until he retired in 1997. He is now a professor emeritus.

10. Dr. Champlin's research focused on battery testing.

11. Dr. Champlin is an inventor of over 30 patents in the battery testing area and continues to apply for patents.

12. Dr. Champlin is the sole inventor of the '416 Patent, which issued on March 27, 1990. (DTX 2).

## II.  Argus Analyzers and BPPower

13.  Argus Analyzers was founded in 2005. (Argus Dep. Tr. 14:24–15:2).

14.  Argus Analyzers is headquartered in Jamestown, Rhode Island. (Argus Dep. Tr. 19:14–17).

15.  Andrew Kallfelz is the owner and sole employee of Argus Analyzers. (Argus Dep. Tr. 19:22–25).

16.  BPPower was founded in 2000. (BPPower Dep. Tr. 20:18–21:4).

17.  BPPower is headquartered in Taipei, Taiwan. (BPPower Dep. Tr. 21:5–6).

18.  BPPower employs approximately twelve people. (BPPower Dep. Tr. 22:3–4).

19.  Benson Huang is the owner and president of BPPower. (BPPower Dep. Tr. 21:22–22:8).

## III.  '756 Patent

20.  Stephen McShane, Kevin Bertness, and Keith Champlin are the inventors of the '756 Patent. (Uncontested Fact No. 2; PTX 1, p. MID1628).

21.  The application leading to the '756 Patent was filed on September 26, 1996. (Uncontested Fact No. 1; PTX 1, p. MID1628).

22.  The United States Patent and Trademark Office issued the '756 Patent on October 13, 1998. (Uncontested Fact No. 1; PTX 1, p. MID1628).

23.  On or about September 20, 1996, Stephen McShane, Kevin Bertness, and Keith Champlin assigned their rights to the '756 Patent to Midtronics. (Uncontested Fact No. 3; PTX 2, pp. MID412–13).

24.  Since September 20, 1996 and continuing to the present day, Midtronics has been the sole owner of the '756 Patent. (Uncontested Fact No. 4; PTX 2, pp. MID412–13).

25.     Midtronics has non-exclusively licensed rights to use the '756 Patent to at least one other company. (McShane Dep. Tr. 69:14–24, 79:10–23).

**IV.     Development of the '756 Patent Invention**

26.     Midtronics is the pioneer of conductance testing technology for testing automotive and standby batteries.

27.     Midtronics' conductance technology has become the industry standard for testing automotive and standby batteries.

28.     Prior to Midtronics' conductance technology, the battery industry relied on load testing to test automotive batteries.

29.     Load testing requires fully charging a battery before testing it. This requires a long delay to test and can require the customer to leave the battery with a mechanic overnight in order to test the battery. Also, the load test leaves the battery in a reduced state of charge after testing. The load test is dependent on the individual operator's ability, which can result in unreliable testing. As a result of these problems, customers were dissatisfied with load testing of batteries.

30.     A Midtronics' invention that received a Motor Magazine Top Twenty Award in 1994 innovated a better method for testing batteries. The '416 Patent describes an invention that allows an operator to test a battery when it is not fully charged (*i.e.*, when it is in a reduced state of charge).

31.     Midtronics sold an analog testing device that incorporated the invention of the '416 Patent to Ford Motor Co. in the early 1990s.

32.     Sales to Ford were successful, and Midtronics attempted to market the same device to Sears.

4

33.     In preliminary testing in 1995, Sears did not find the '416 Patented device accurate enough for the numerous batteries it serviced and sold at its stores nationwide. The inventors of '756 Patent were at first unable to determine the reason for the unreliable results from the '416 Patented device in the Sears testing. They researched and pursued a number of possible reasons for the inconsistent test results.

34.     In 1996, based on Sears' concerns and information about the batteries it sold, Midtronics determined, after more than a year of research and experimentation, that it could obtain more accurate results if it adjusted the test to correct for the fact that different battery types have different conductance characteristics. The inventors of the '756 Patent invented a device that could correct conductance test results to compensate for the type of battery being tested.

35.     Midtronics applied for the '756 Patent based on this new invention.

36.     The first product Midtronics sold that incorporated the '756 Patent invention was a digital battery tester it sold to Sears in 1996 called the DMP-PSR1 MicroPro battery tester. The invention manifested in the '756 Patent would have been impractical without digital technology that was just becoming commercially available in the industry.

37.     During 1996 and 1997, Midtronics sold millions of dollars of battery testers that used the innovation of the '756 Patent, as well as millions of dollars of battery testers that only used the '416 Patent, despite the fact that the average price of testers using the '756 Patent was $500 and the average price of testers that only used the '416 Patent was $350. (PTX 67).

**V.      Defendants' Offers for Sale, Sales, and Importation of the Accused Products**

38.     Argus Analyzers is the exclusive distributor of all BPPower products in the United States. (Uncontested Fact No. 8; PTX 40).

39.     Since at least 2007, Argus Analyzers sold and continues to sell the AA350 battery tester in the United States. (Uncontested Fact No. 7; PTX 42, p. ARGUS1170).

40.     Since at least 2005, Argus Analyzers sold and continues to sell the AA400 battery tester in the United States. (Uncontested Fact No. 7; PTX 42, p. ARGUS583).

41.     From 2005–07, Argus Analyzers sold the AA500 battery tester in the United States. (Uncontested Fact No. 7; PTX 41; Argus Dep. Tr. 57:23–58:10, 217:8–218:17).

42.     Since 2005, Argus Analyzers sold and continues to sell the AA500P battery tester in the United States. (Uncontested Fact No. 7; PTX 41; Argus Dep. Tr. 217:8–218:17).

43.     Since 2009, Argus Analyzers offered the AA550P battery tester for sale in the United States. (Uncontested Fact No. 8; PTX 65; PTX 75).

44.     Since at least 2007, BPPower manufactured and continues to manufacture the AA350 battery tester. (Uncontested Fact No. 5; PTX 42, p. ARGUS1170; BPPower Dep. Tr. 27:23–28:10).

45.     Since at least 2005, BPPower manufactured and continues to manufacture the AA400 battery tester. (Uncontested Fact No. 5; PTX 42, p. ARGUS583; BPPower Dep. Tr. 27:23–28:10).

46.     BPPower manufactured the AA500 battery tester in 2005. (Uncontested Fact No. 5; BPPower Dep. Tr. 38:2–9).

47.     Since 2005, BPPower manufactured and continues to manufacture the AA500P battery tester. (Uncontested Fact No. 5; PTX 41; Huang Dep. Tr. 40:14–41:7).

48.     Since 2009, BPPower manufactured the AA550P battery tester. (Uncontested Fact No. 5; PTX 65).

6

49.     Since at least 2007, BPPower sold and continues to sell the AA350 battery tester to Argus Analyzers in the United States. (Uncontested Fact No. 6).

50.     Since at least 2005, BPPower sold and continues to sell the AA400 battery tester to Argus Analyzers in the United States. (Uncontested Fact No. 6).

51.     BPPower sold the AA500 battery tester to Argus Analyzers in the United States in 2005. (Uncontested Fact No. 6; PTX 43).

52.     Since 2005, BPPower sold and continues to sell the AA500P battery tester to Argus Analyzers in the United States. (Uncontested Fact No. 6; PTX 43).

53.     Since 2009, BPPower sold and imported the AA550P battery tester to Argus Analyzers in the United States. (Uncontested Fact No. 6; PTX 65).

## VI.    Accused Products

### A.    Claim 1, First Element—"Input Circuitry"

54.     The Accused Products are electronic battery testers that can test WET, VRLA, and MF automotive battery types. (PTX 28, pp. BP3 and 5; Argus Dep. Tr., 79:25–80:6).

55.     There are buttons on the front of the Accused Products that allow the user to select which type of battery is being tested. (PTX 28, pp. BP3–5; BPPower Dep. Tr. 103:9–11).

56.     The buttons on the front of the Accused Products are electrically coupled to the microprocessor and software in the Accused Products. (PTX 12, p. BP182; BPPower Dep. Tr. 121:22–122:24).

57.     By pressing the buttons on the front of the Accused Products, the user selects which battery type the Accused Products will compensate for. (PTX 28, pp. BP3–5).

58.     Based on the facts in paragraphs 54–57, the Accused Products have input circuitry for receiving information related to the type of the battery. (Uncontested Fact No. 10).

**B.     Claim 2, Second Element—"Dynamic Battery Parameter Determining Circuitry"**

59.     The Court construed the claim term "dynamic parameter" to mean "the dynamic conductance or the dynamic resistance of a battery." (PTX 70, p. 5).

60.     The Court construed the claim term "dynamic resistance" to mean "the change in voltage through an element divided by the change in current across the element." (PTX 70, p. 8).

61.     The Court construed the claim term "dynamic conductance" to mean "the change in current through an element divided by the change in voltage across the element." (PTX 70, p. 8).

62.     The Accused Products measure the voltage of the battery when no current is being drawn and store that measurement in a variable called Battery[3].AllValue. (PTX 12, p. BP175).

63.     The Accused Products then draw an approximately 100 amp current pulse from the battery being tested for less than a millisecond. (BPPower Dep. Tr. 86:11–13, 86:25–87:5).

64.     Next, the Accused Products twice measure the amount of current being drawn from the battery during the pulse and store the value of the current drawn from the battery in variables called currenttemp[0] and currenttemp[1]. These two values are averaged and stored in a variable called Current.AllValue. (PTX 12, pp. BP175–76). Because no current is drawn from the battery before the 100 amp current pulse load is applied, this 100 amp current load is the change in current through the battery.

65.     While the 100 amp current is being drawn from the battery, the Accused Products measure the voltage of the battery and store it in variables called ADArray[0].AllValue and Battery[2].AllValue. (PTX 12, pp. BP175–76).

66.     The microprocessor in the Accused Products calculates the change in voltage across the battery with and without the current load by subtracting Battery[2].AllValue from

Battery[3].AllValue. This result is stored in a variable called BatteryL.AllValue. (PTX 12, p. BP176).

67.     The microprocessor in the Accused Products calculates the dynamic resistance of the battery by dividing the change in voltage during the test (BatteryL.AllValue) by the current change in drawn from the battery (Current.AllValue). The result of this calculation is stored in variables called DisplayValue[SelectAH] and BLDisplay[2].LCD6_9. (PTX 12, pp. BP176 and 180).

68.     The microprocessor in the Accused Products calculates the dynamic conductance of the battery by inverting the dynamic resistance. The result of this calculation is stored in variables called DisplayValue[SelectMHO] and BLDisplay[3].LCD6_9. (PTX 12, pp. BP176 and 180).

69.     Based on the facts in paragraphs 59–68, the Accused Products have dynamic battery parameter determining circuitry for determining an intermediate dynamic parameter of the battery. (Uncontested Fact No. 12).

### C.     Claim 1, Third Element—"Open Circuit Voltage Sense Circuitry"

70.     The Accused Products are connected to the battery by a pair of battery clamps, which are electrically coupled to the microprocessor. (PTX 28, p. BP5; PTX 10).

71.     The Accused Products measure the open-circuit voltage of the battery being tested, and the microprocessor stores this value in a variable called SoCDisplay.LCD6_9. (PTX 12, p. BP179).

72.     Based on the facts in paragraphs 70–71, the Accused Products have open circuit voltage sense circuitry coupled to the battery for sensing an open circuit voltage of the battery. (Uncontested Fact No. 11).

### D.    Claim 1, Fourth Element—"Correction Circuitry"

73.    The Court construed the claim term "intermediate dynamic parameter" to mean "unadjusted or uncorrected dynamic battery parameter." (PTX 70, p. 8).

74.    The Accused Products adjust the dynamic conductance of the battery (DisplayValue[SelectMHO]) by first converting it into a CCA value by multiplying the dynamic conductance by a constant number. The result of this calculation is stored in a variable called DisplayValue[SelectCCA]. (PTX 12, p. BP176).

75.    The Accused Products adjust the CCA value by multiplying it by a constant number that is different for different battery types. The result of this calculation is overwritten in the variable DisplayValue[SelectCCA]. (PTX 12, p. BP176).

76.    The Accused Products calculate a state of charge percentage (SoCPercent) that is equal to the open-circuit voltage (SoCDisplay.LCD6_9) multiplied by a constant number minus a factor (add_v) that is different for different battery types. (PTX 12, p. BP179).

77.    The Accused Products adjust the adjusted CCA value by dividing it by the state of charge percentage (SoCPercent). The result of this calculation is stored in a variable called BLDisplay[0].LCD6_9. (PTX 12, p. BP180).

78.    Based on the facts in paragraphs 73–76, the Accused Products adjust the dynamic battery parameter based on battery type information.

79.    Based on the facts in paragraphs 73, 76, and 77, the Accused Products adjust the dynamic battery parameter based on the open circuit voltage of the battery.

80.    Based on the facts in paragraphs 73–79, the Accused Products have correction circuitry coupled to the dynamic battery parameter determining circuitry, to the open circuit voltage sense circuitry and to the input circuitry which adjusts the determined intermediate

dynamic parameter based upon the battery type information and upon a value of the open circuit voltage of the battery. (Uncontested Fact No. 13).

### E.   Claim 1, Fifth Element—"Output Circuitry"

81.    The microprocessor in the Accused Products calculates a battery life percentage (BLDisplay[0].Percent) based on the twice-adjusted CCA value (BLDisplay[0].LCD6_9) in a subroutine called ConvertBL. (PTX 12, pp. BP179–80).

82.    The microprocessor in the Accused Products calculates a battery life test result based on the open-circuit voltage and battery life percentage in a subroutine called CheckLimit. (PTX 12, p. BP187).

83.    The Accused Products display the twice-adjusted CCA value (BLDisplay[0].LCD6_9), a battery life percentage (BLDisplay[0].Percent), and an icon displaying the battery life test results. (PTX 28, p. BP8).

84.    Based on the facts in paragraphs 81–83, the Accused Products have output circuitry coupled to the correction circuitry for providing test results indicative of the condition of the battery, wherein the test results are provided as a function of the adjusted intermediate parameter. (Uncontested Fact No. 14).

### F.   Claim 1, Preamble

85.    Based on the facts in paragraphs 58, 69, 72, 80, and 84, the Accused Products are electronic devices for monitoring or testing a battery having one of a plurality of battery types associated therewith. (Uncontested Fact No. 9).

### G.     Claim 2

86.     Based on the facts in paragraphs 81–83, the Accused Products display test results that comprise qualitative results in conformance with the adjusted intermediate dynamic parameter relative to a reference dynamic parameter value.

### H.     Claim 3

87.     The Accused Products contain 18F2525, 16F876, or 16F886 microprocessors. (BPPower Dep. Tr. 67:23–25, 69:6–8; PTX 4; PTX 6; PTX 13; PTX 16; PTX 17; PTX 18; PTX 19; PTX 20; PTX 21; PTX 22; PTX 23; PTX 25).

88.     Based on the facts in paragraphs 73–77 and 87 the Accused Products have correction circuitry that comprises a microprocessor and wherein digital representations of the open circuit voltage and the intermediate dynamic parameter are both inputted to the microprocessor and combined algorithmically to adjust the intermediate dynamic parameter.

### I.     Claim 4

89.     The Accused Products do not display a battery life percentage or an icon displaying the battery life test results if the open-circuit voltage of the battery is below the threshold value stored in the variable Threshold1. (PTX 28, p. BP8; PTX 12, pp. BP180 and 187; BPPower Dep. Tr. 121:2–21).

90.     Based on the facts in paragraph 89, the Accused Products have output circuitry that provides a special indication when the open circuit voltage is less than a predetermined value and suppresses the test results when the open-circuit voltage is less than the predetermined value.

12

## VII.    Willful Infringement

91.    Argus Analyzers and BPPower designed and developed the Accused Products long after the '756 Patent was issued. (Argus Dep. Tr. 34:24–36:20; BPPower Dep. Tr. 34:4–38:1, 39:23–40:13). Mr. Huang of BPPower admits that he looked at the Midtronics battery testers in 2004 before he began development of the Accused Products. (BPPower Dep. Tr. 14:8–16:13).

92.    In March 2006, Mr. McShane of Midtronics met with Mr. Kallfelz of Argus Analyzers and Mr. Huang of BPPower and discussed Defendants' infringement of Midtronics' patents through the sale of the Argus Analyzer battery testers. (PTX 49).

93.    On March 17, 2006, Mr. McShane e-mailed Mr. Huang to reiterate that Defendants' battery testers infringed Midtronics' patents. (PTX 49).

94.    Defendants ignored Midtronics' notice of infringement and continued to import, sell, and offer for sale their battery testers that infringed Midtronics' patents after these conversations with Mr. McShane. (PTX 41 and 42).

95.    A technology brief on Large Pulse Resistance technology (Defendants' claimed method of testing), which was authored by Mr. Kallfelz before the lawsuit was filed described Defendants' technology as determining the internal resistance of a battery "by measuring the "change in battery voltage during the pulse load." (PTX 32). After the lawsuit was filed by Midtronics, Mr. Kallfelz removed this language and stated in the new technology brief that the internal resistance of a battery is measured "by determining the amount of current that was drawn from the battery during the test and using ohm's law." (PTX 34). Mr. Kallfelz cannot remember why he made this revision to the technology brief after Midtronics filed the lawsuit. (Argus Dep. Tr. 177:5–178:2). Neither Argus nor BPPower made any change in the technology

used in the Accused Products; Mr. Kallfelz merely changed the description after Midtronics filed the lawsuit.

96.     Midtronics filed suit on July 20, 2006 for infringement of the '416 and '756 Patents. (Docket No. 1).

97.     Prior to Midtronics' filing suit on July 20, 2006, Defendants never obtained an opinion of counsel regarding whether they infringed the '756 Patent or whether the '756 Patent is valid.

98.     The Court issued its construction of the disputed claim terms in the '756 Patent on July 11, 2008. (PTX 70).

99.     On July 17, 2009, counsel for Defendants informed the Court at a status hearing that Defendants would redesign their battery testing products to eliminate any infringement and voluntarily stop selling the products that were then accused of infringing the '756 Patent. (Docket Nos. 145 and 149).

100.     On October 7, 2009, Defendants sent Midtronics a sample of this redesigned product (the AA550P battery tester). On October 26, 2009, Midtronics advised Defendants that the AA550P also infringed the '756 Patent.

101.     Defendants knew that the AA550P battery tester infringed the '756 Patent when they sent it to Midtronics, stating in internal correspondence that was "what we expected." (PTX 66).

102.     Defendants knew that the AA550P battery tester infringed the '756 Patent when they offered it for sale to a company in the United States. (PTX 66).

103.     Defendants have never stopped selling any of the Accused Products that they were selling in July 2009.

## VIII.  Validity of Claims 1–4 of the '756 Patent

104.    The '416 Patent (DTX 2) does not disclose or teach input circuitry for receiving information related to the type of the battery.

105.    The '416 Patent (DTX 2) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the battery type information.

106.    The article "Updated Status of Conductance/Capacity Correlation Studies to Determine the State-of-Health of Automotive SLI and Stand-by Lead Acid Batteries" in Midtronics' Encyclopedia of Conductance (DTX 19) does not disclose or teach input circuitry for receiving information related to the type of the battery.

107.    The article "Updated Status of Conductance/Capacity Correlation Studies to Determine the State-of-Health of Automotive SLI and Stand-by Lead Acid Batteries" in Midtronics' Encyclopedia of Conductance (DTX 19) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the battery type information.

108.    The article "Are Internal Cell Parameter Measurements a Substitute or Supplement to Capacity Testing?" by Glenn Alber (DTX 20) does not disclose or teach input circuitry for receiving information related to the type of the battery.

109.    The article "Are Internal Cell Parameter Measurements a Substitute or Supplement to Capacity Testing?" by Glenn Alber (DTX 20) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the

battery type information. Indeed, this article concludes that corrections to its measurement methodology are unnecessary.

110.     United States Patent Number 5,164,652 by Johnson *et al.* (DTX 12) discloses a detector for battery charging equipment.

111.     United States Patent Number 5,164,652 by Johnson *et al.* (DTX 12) does not disclose, teach, or mention dynamic battery parameters (*i.e.*, dynamic resistance or dynamic conductance). It addresses charging, but not the testing of batteries.

112.     United States Patent Number 5,164,652 by Johnson *et al.* (DTX 12) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the battery type information.

113.     United States Patent Number 4,849,682 by Bauer *et al.* (DTX 13) merely discloses a battery charging system.

114.     United States Patent Number 4,849,682 by Bauer *et al.* (DTX 13) does not disclose, teach, or mention dynamic battery parameters.

115.     United States Patent Number 4,849,682 by Bauer *et al.* (DTX 13) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the battery type information.

116.     United States Patent Number 4,965,738 by Bauer *et al.* (DTX 14) merely discloses a battery charging system.

117.     United States Patent Number 4,965,738 by Bauer *et al.* (DTX 14) does not disclose, teach, or mention dynamic battery parameters.

16

118.    United States Patent Number 4,965,738 by Bauer *et al.* (DTX 14) does not disclose or teach correction circuitry coupled to the dynamic battery parameter determining circuitry and to the input circuitry which adjusts the determined intermediate dynamic parameter based upon the battery type information.

## Proposed Conclusions of Law

### IX.    AA350 Infringement

119.    Based on the facts identified in paragraphs 39, 49, 85, 58, 69, 72, 80, and 84, Argus Analyzers and BPPower infringe claim 1 of the '756 Patent through the offers to sell, sales, and importation of the AA350.

120.    Based on the facts identified in paragraphs 39, 49, 85, 58, 69, 72, 80, 84, and 86, Argus Analyzers and BPPower infringe claim 2 of the '756 Patent through the offers to sell, sales, and importation of the AA350.

121.    Based on the facts identified in paragraphs 39, 49, 85, 58, 69, 72, 80, 84, and 88, Argus Analyzers and BPPower infringe claim 3 of the '756 Patent through the offers to sell, sales, and importation of the AA350.

122.    Based on the facts identified in paragraphs 39, 49, 85, 58, 69, 72, 80, 84, and 90, Argus Analyzers and BPPower infringe claim 4 of the '756 Patent through the offers to sell, sales, and importation of the AA350.

### X.    AA400 Infringement

123.    Based on the facts identified in paragraphs 40, 50, 85, 58, 69, 72, 80, and 84, Argus Analyzers and BPPower infringe claim 1 of the '756 Patent through the offers to sell, sales, and importation of the AA400.

124.    Based on the facts identified in paragraphs 40, 50, 85, 58, 69, 72, 80, 84, and 86, Argus Analyzers and BPPower infringe claim 2 of the '756 Patent through the offers to sell, sales, and importation of the AA400.

125.    Based on the facts identified in paragraphs 40, 50, 85, 58, 69, 72, 80, 84, and 88, Argus Analyzers and BPPower infringe claim 3 of the '756 Patent through the offers to sell, sales, and importation of the AA400.

126.    Based on the facts identified in paragraphs 40, 50, 85, 58, 69, 72, 80, 84, and 90, Argus Analyzers and BPPower infringe claim 4 of the '756 Patent through the offers to sell, sales, and importation of the AA400.

## XI.    AA500 Infringement

127.    Based on the facts identified in paragraphs 41, 51, 85, 58, 69, 72, 80, and 84, Argus Analyzers and BPPower infringe claim 1 of the '756 Patent through the offers to sell, sales, and importation of the AA500.

128.    Based on the facts identified in paragraphs 41, 51, 85, 58, 69, 72, 80, 84, and 86, Argus Analyzers and BPPower infringe claim 2 of the '756 Patent through the offers to sell, sales, and importation of the AA500.

129.    Based on the facts identified in paragraphs 41, 51, 85, 58, 69, 72, 80, 84, and 88, Argus Analyzers and BPPower infringe claim 3 of the '756 Patent through the offers to sell, sales, and importation of the AA500.

130.    Based on the facts identified in paragraphs 41, 51, 85, 58, 69, 72, 80, 84, and 90, Argus Analyzers and BPPower infringe claim 4 of the '756 Patent through the offers to sell, sales, and importation of the AA500

## XII.  AA500P Infringement

131.  Based on the facts identified in paragraphs 42, 52, 85, 58, 69, 72, 80, and 84, Argus Analyzers and BPPower infringe claim 1 of the '756 Patent through the offers to sell, sales, and importation of the AA500P.

132.  Based on the facts identified in paragraphs 42, 52, 85, 58, 69, 72, 80, 84, and 86, Argus Analyzers and BPPower infringe claim 2 of the '756 Patent through the offers to sell, sales, and importation of the AA500P.

133.  Based on the facts identified in paragraphs 42, 52, 85, 58, 69, 72, 80, 84, and 88, Argus Analyzers and BPPower infringe claim 3 of the '756 Patent through the offers to sell, sales, and importation of the AA500P.

134.  Based on the facts identified in paragraphs 42, 52, 85, 58, 69, 72, 80, 84, and 90, Argus Analyzers and BPPower infringe claim 4 of the '756 Patent through the offers to sell, sales, and importation of the AA500P.

## XIII.  AA550P Infringement

135.  Based on the facts identified in paragraphs 43, 53, 85, 58, 69, 72, 80, and 84, Argus Analyzers and BPPower infringe claim 1 of the '756 Patent through the offers for sale and importation of the AA550P.

136.  Based on the facts identified in paragraphs 43, 53, 85, 58, 69, 72, 80, 84, and 86, Argus Analyzers and BPPower infringe claim 2 of the '756 Patent through the offers for sale and importation of the AA550P.

137.  Based on the facts identified in paragraphs 43, 53, 85, 58, 69, 72, 80, 84, and 88, Argus Analyzers and BPPower infringe claim 3 of the '756 Patent through the offers for sale and importation of the AA550P.

138.     Based on the facts identified in paragraphs 43, 53, 85, 58, 69, 72, 80, 84, and 90, Argus Analyzers and BPPower infringe claim 4 of the '756 Patent through the offers for sale and importation of the AA550P.

## XIV.  Willful Infringement

139.     Based on the facts identified in paragraphs 38–103 and the conclusions of law identified in paragraphs 119–138, Argus Analyzes' and BPPower's infringement of claims 1–4 of the '756 Patent through the offers for sale, sales, and importation of the Accused Products is willful.

## XV.  Validity of Claims 1–4 of the '756 Patent

140.     Based on the facts identified in paragraphs 1–37 and 104–118, Defendants have not proven by clear and convincing evidence that claims 1–4 of the '756 Patent are invalid as being obvious in light of the prior art.

## XVI.  Relief Requested

141.     For the reasons stated above, Plaintiff is entitled to

A.     a finding that Defendants willfully infringed claims 1–4 of the '756 Patent by their offers for sale, sales, and importation of the Accused Products;

B.     a determination that Defendants have failed to prove by clear and convincing evidence that claims 1–4 are invalid;

C.     an injunction against Defendants prohibiting them from offering for sale, selling, using, or manufacturing the Accused Products (or those that are not colorably different) in the United States, or importing them into the United States, for the remaining lifetime of the '756 Patent;

20

D.  a declaration that this is an exceptional case;

E.  Plaintiffs' attorneys' fees and cost; and

F.  any other relief the Court determines is just and proper.


Dated: December 27, 2010                    Respectfully Submitted,

                                            /s/Robert L. Wagner
                                            Attorneys for Plaintiff Midtronics, Inc.

                                            H. Roderic Heard
                                            BARNES & THORNBURG LLP
                                            One North Wacker Drive
                                            Suite 4400
                                            Chicago, IL 60606
                                            Tel: (312) 357-1313
                                            Fax: (312) 759-5646

                                            Robert L. Wagner
                                            PICADIO SNEATH MILLER & NORTON, P.C.
                                            4710 U.S. Steel Tower
                                            600 Grant St.
                                            Pittsburgh, PA 15219
                                            Tel: (412) 288-4000
                                            Fax: (412) 288-2405

## CERTIFICATE OF SERVICE

I, Robert L. Wagner, an attorney, hereby certify that I caused a copy of the foregoing PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW to be filed via electronic filing on this 27th day of December, 2010, and thereby served upon:

Michael M. de Angeli             mdeange@cox.net

Patrick J. Kelleher             patrick.kelleher@dbr.com

Christopher H. Strate             cstrate@ssjr.com


*/s/Robert L. Wagner*